# EXHIBIT B

**In The Matter Of:**

*AUTRY v.*

*CITY OF PHILADELPHIA, et al.*

---

*OFFICER TIMOTY MURPHY*

*August 11, 2015*

---

*Francis A. Farrell & Associates*

*1300 Arrott*

*Philadelphia, Pennsylvania 19124*

Original File 08-11-15 Murphy.txt

**Min-U-Script® with Word Index**

JEHIEL AUTRY, a minor by and through his parent parent and natural guardian, PURNELL AUTRY, Plaintiff : COURT OF COMMON PLEAS : PHILADELPHIA COUNTY

vs. : CIVIL ACTION - LAW

THE CITY OF PHILADELPHIA, and CHARLES H. RAMSEY, and POLICE OFFICER JASON REID and POLICE OFFICER TIMOTHY MURPHY and AUSTIN VERNON and SHILA AUSTIN, Defendants : MAY TERM, 2014 : NO. 002074

\- - -

Videotaped deposition of POLICE OFFICER TIMOTHY MURPHY, taken at the law offices of Michael T. van der Veen, 1219 Spruce Street, Philadelphia, PA, 19107, on Tuesday, August 11, 2015, beginning at approximately 10:00 a.m., before Donna M. Simpkins, Professional Court Reporter, Notary Public.

**************************************************

FRANCIS A. FARRELL & ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
PENNSYLVANIA, NEW JERSEY AND DELAWARE
(215) 834-4288



APPEARANCES:

LAW OFFICES OF MICHAEL T. VAN DER VEEN
BY: BRIAN D. HARTSHORN, ESQUIRE
1219 Spruce Street
Philadelphia, PA 19107
(215) 546-1000

Counsel for the Plaintiff

CITY OF PHILADELPHIA
BY: HANNAH GIRER-ROSENKRANTZ, ESQUIRE
One Parkway Building
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
(215) 683-5398

Counsel for the Defendants

\- - -

VIDEOGRAPHER: John Baders



I-N-D-E-X


| WITNESS | PAGE |
|---|---|
| Police Officer Timothy Murphy | |
| Examination | |
| By: Mr. Hartshorn | 5, 107, 111 |
| By: Ms. Girer-Rosenkrantz | 100, 110 |


\- - -

INDEX TO EXHIBITS


| MURPHY EXHIBIT NUMBER | | PAGE MARKED |
|---|---|---|
| No. 1 | Directive 41 | 23 |
| No. 2 | Google Map | 23 |
| No. 3 | East Band Recordings 5/9/14 | 52 |
| No. 4 | J Band Recordings 5/9/14 | 53 |
| No. 5 | Investigation Report | 80 |
| No. 6 | Arrest Report | 83 |
| No. 7 | Complaint or Incident Report | 84 |
| No. 8 | Vehicle/Pedestrian Investigation Report | 86 |
| No. 9 | Interview Report | 88 |
| No. 10 | Three photographs | 93 |


\- - -



THE VIDEOGRAPHER: We are now on the record. My name's John Baders. I'm a videographer retained by Farrell & Associates.

This is a video deposition for the Court of Common Pleas, Philadelphia County. Today's date is August 11, 2015, and the video time is 10:33 a.m.

This deposition is being held at 1219 Spruce Street in Philadelphia, Pennsylvania, in the matter of Autry versus the City of Philadelphia. The deponent is Officer Murphy.

All counsel will be noted on the stenographic record.

The court reporter is Donna Simpkins and will now swear in the witness.

THE COURT REPORTER: Officer, would you raise your right hand, please.

\- - -

OFFICER TIMOTHY MURPHY, after having been first duly sworn as a witness, was examined and testified as follows:

\- - -

Page 5

THE VIDEOGRAPHER: We may proceed.
- - -
EXAMINATION
- - -
BY MR. HARTSHORN:
Q. Officer, could you please state your full name for the record.
A. Officer Timothy Murphy, M-U-R-P-H-Y.
Q. Officer Murphy, I've had a chance to review your file. I saw many accommodations and merits in there so first off, I just want to thank you for your service. My questions are not meant to be disrespectful in any way. I'm just trying to gather all the facts in this case.
Have you ever had your deposition taken before?
A. Yes.
Q. Okay. I'm sure your attorney has provided you all the instructions that you need, but I just want to go over those instructions to make sure we're clear.
First off, do you have anywhere pressing that you need to be in the next hour and a half, two hours?

Page 6

A. Not that I'm aware of.
Q. Okay. All of your questions -- all of my answers -- your questions, my answers have to be verbal; okay? If you don't understand one of my questions, please let me know because if you answer the question, it will appear on the record as if you understood that question; okay?
A. Yes.
Q. Is there anything preventing you from understanding my questions and giving clear and accurate answers?
A. No.
Q. Did you review any documents in preparation for today's deposition?
A. Yes.
Q. What did you review?
A. Several minutes ago, it was a 48, PARS report, O and P, there was a couple property receipts in the -- the little packet I looked at and maybe a couple other things I may have forgotten.
Q. Okay. No problem.
If at any point in time you need to take a break for whatever reason -- use the

Page 7

restroom, get a drink -- that's fine. I only ask that you complete your answer if there's a question pending; okay?
A. Yes.
Q. Officer, what's your badge number and rank?
A. 4850, police officer.
Q. How long have you served as a police officer?
A. Eighteen years.
Q. I could see this is a younger photo of you; right?
A. Yes, it was.
Q. Any promotions during that time?
A. No.
Q. What unit are you currently assigned to?
A. Currently assigned to the Highway Patrol.
Q. Okay. And I see from your file you started that in 2004?
A. Yes, sir.
Q. You were transferred there?
A. Yes.
Q. What was the reason for the transfer?
A. Voluntarily, I submitted a request to be transferred.

Page 8

Q. Okay. Do you currently reside in Philadelphia?
A. Yes.
Q. For how long have you lived there?
A. Thirty-six years.
Q. Okay. Where did you attend high school?
A. Robert E. Lamberton High School.
Q. And where did you go after that?
A. I did almost two years at Temple University.
Q. And I'm assuming you attended the Police Academy?
A. Yes.
Q. And when was that?
A. June of -- I forget the exact day, but June 1997.
Q. How long was the term you attended? Six months?
A. Yeah, six months.
Q. Okay.
A. And June came out so...
Q. And after you left the Academy, did you receive any other education or training pertaining to your job?
A. Over the years, I took training courses that

Page 9

may have come up voluntarily.
Q. Okay.
A. A few.
Q. And is this all within the police department?
A. Yes.
Q. Okay. Did any of your training involve the operation of patrol vehicles?
A. In the -- in the police academy, yes.
Q. How about subsequent to the police academy?
A. They had -- I don't want to call them retrainer courses, but they started mandating every so often you go back up for a day of driver's training, I believe they called it.
Q. Is it something you have to get recertified every so often?
A. I don't know.
Q. Okay. Are there any directives with regard to the operation of a patrol vehicle?
A. Yes.
Q. Are you familiar with them?
A. Yes.
Q. Do you maintain them in some fashion? For instance, a binder on a computer so that you can

Page 10

refer to them when you need to.
A. They have them on the computers inside. I had a binder with all of them, but I don't know where that is currently.
Q. All right. Are you familiar with Directive 41?
A. Not off the top of my head, no.
Q. Sure. Officer Murphy, I'm going to hand you through your counsel what we'll mark as Murphy 1. I'll represent to you that this is a copy of Directive 41.
MS. GIRER-ROSENKRANTZ: Would you like him to read that or just --
MR. HARTSHORN: No.
BY MR. HARTSHORN:
Q. You can just review it to yourself, please. I'm not asking you to review the whole directive, but if you can just briefly skim through that, and maybe that will refresh your recollection?
A. (Witness reviewing document.)
MS. GIRER-ROSENKRANTZ: Are you good, Officer?
THE WITNESS: Yeah, not unless you want me to...

Page 11

MS. GIRER-ROSENKRANTZ: Is there anything specific you want --
MR. HARTSHORN: No. I have no question pending.
BY MR. HARTSHORN:
Q. Officer, have you had a chance to briefly review it?
A. Yes, the first couple pages.
Q. Does that refresh your recollection as to what Directive 41 is?
A. Yes.
Q. Okay. And am I correct that the subject of this directive is vehicular pursuits?
A. Yes.
Q. And now that you've had a chance to see what it is, are you familiar with that directive?
A. Yes.
Q. When did you first become familiar with this directive?
A. This would have been 1997.
Q. Okay. And is this directive one of the directives that is maintained in the computers at the Philadelphia Police Department?
A. Yes.

Page 12

Q. And, presumably, in the binder that is somewhere of yours?
A. Yes.
Q. Okay. And am I correct that you are familiar with when you can and cannot initiate a vehicular pursuit?
A. Yes.
Q. Is this directive something that's continually updated?
A. Yes.
Q. Do you know how often?
A. No, I do not.
Q. Do you know when the last time this directive was updated?
A. I don't recall.
Q. In looking at number one, "Policy and Pursuit Justification," does this look updated to you?
MS. GIRER-ROSENKRANTZ: Can you rephrase.
MR. HARTSHORN: Sure.
MS. GIRER-ROSENKRANTZ: Is it current?
BY MR. HARTSHORN:

Page 13

Q. Is there anything in there that seems outdated?
A. I couldn't tell you. I have no idea.
Q. Okay. How about the definition -- under number two, definitions of vehicular pursuit: The use of a motor vehicle to chase, follow or go after a vehicle that has refused to stop. Does that sound right to you?
A. I'm not quite understanding. What do you mean by "sound right"?
Q. Is that updated?
A. I have no idea.
MS. GIRER-ROSENKRANTZ: Could I just possibly rephrase.
According to your understanding of what the directives are today, is that in line with today's directive? Is it the same standard that you would use today?
THE WITNESS: Okay, yes.
BY MR. HARTSHORN:
Q. Okay. And was that true in 2009?
A. Yes, I believe so.
Q. How much of your work is as a patrol officer?

Page 14

A. I'm sorry. Could you repeat it.
Q. Yeah. You're a patrol officer; correct?
A. Yes.
Q. How much of your work is as a patrol officer?
A. I couldn't specifically say 'cause over the last couple years, I've been known to handle administrative operations room duties as well, filling in for people as needed, so I'm split between the two on occasion.
Q. Okay.
A. But the bulk of the time is patrol.
Q. Okay. How about in the last three years, is there a percentage you can attribute to patrol officer or other --
A. No, I cannot.
Q. -- duties?
A. No.
MS. GIRER-ROSENKRANTZ: Please just wait for him to finish asking the question just to make sure the court reporter can hear you both. Thank you.
BY MR. HARTSHORN:
Q. As a patrol officer, are you ever the driver of the vehicle?

Page 15

A. If I'm by myself, I am.
Q. Okay. If you're partnered with someone, are you typically the driver or the recorder?
A. I tend to do the recording.
Q. Okay. What are the duties of a recorder?
A. Record down -- maintain the patrol log, so write down, you know, times of you answer a job or you pull people over or initiate stops, investigations, paperwork, 7548's, incident reports and all the various paperwork.
Q. If -- if there is a pursuit, are you -- is part of the duty directing the driver or offering advice?
MS. GIRER-ROSENKRANTZ: Objection to form. You may answer.
BY MR. HARTSHORN:
Q. Do you understand that question?
A. Can you repeat it, please.
Q. Sure. Is any part of the duties of the recorder during a vehicular pursuit giving recommendations to the driver?
A. Some people may. I -- if that's going on, I usually tend to check my side of the car and let

Page 16

the operator know that traffic is either stopped or there's nothing there and he's clear to go.
Q. Okay. Can you give some examples of what the recorder may do during a vehicular pursuit.
A. They tend to transmit over radio direction and any questions that may arise from a supervisor or the dispatcher, speed, direction, color of the vehicle, license plate, any information, yeah.
Q. Okay. Do you have an independent recollection of the incident of May 9, 2014, which brings us here today?
A. Yes.
Q. What was your shift?
A. Six to two, I believe.
Q. And you were a patrol officer?
A. Yes.
Q. And Officer Reid was your partner?
A. Yes.
Q. For how long had he been your partner as of that date?
A. Don't know.
Q. Is he still your partner?
A. No, he is not.
Q. When did the partnership end?

A. Don't remember.
Q. Okay. Was there any reason for the ending of the partnership?
A. No. They just -- another team was switching out partners and they partnered him with the gentleman from the other team, and then I got reassigned to somebody else.
Q. Were you part of a specific unit?
A. I don't understand.
Q. Highway patrol, violent crimes?
A. Highway patrol.
Q. Did you have a typical assigned area?
A. It changed.
Q. Okay. Changed by shift, by month? How did it change?
A. By day.
Q. Okay. What were your duties or responsibilities when you go out on a typical shift?
A. Answer radio calls that are of high priority, initiate investigations on vehicles, pedestrians, try to curtail crime.
Q. Okay. Would any of your duties involve traffic stops?



A. Yes.
Q. Are there any policies and procedures that you need to follow when initiating a traffic stop?
A. Yes.
Q. Okay. Can you explain those to me.
A. You're supposed to -- upon initiating a stop, you notify radio, give them your location, if you're solo or two person, license plate of the vehicle, how many occupants are in the car, if you know, any clothing description, race, gender, if you can obtain that before exiting the vehicle and approaching.
Q. Okay. And if you're partnered and, for instance, you're the recorder, do you typically radio once you've stopped the car or as you're stopping the car?
A. I'm not exactly understanding.
Q. Sure. You said when you initiate a -- a traffic stop, you call in, give maybe the tags, the description. Do you typically do that as you're pulling them over or once the car's actually pulled over?
A. You're supposed to once the vehicle's stopped.



Q. Okay. During a traffic stop, do you engage your lights or sirens?
A. Yes.
Q. If during your shift you see a vehicle commit a traffic violation, do you typically pull it over?
A. Yes.
Q. Is there a difference between a traffic stop and a car stop?
A. They're one in the same.
Q. Okay. When you make a traffic stop, are there any types of paperwork that's generated?
A. Yes.
Q. Okay. What?
A. It's called a pedestrian/vehicle investigation. It's labeled 7548 A.
Q. I'm assuming the recorder prepares that?
A. Yes. Or the -- the operator can, but normally the recorder does.
Q. Okay. Now, on May 9, 2014, were you the driver or the recorder?
A. Recorder.
Q. As of that date, had you ever been involved in a vehicular pursuit before?



A. Yes.
Q. Approximately how many times?
A. I couldn't tell you exactly.
Q. Okay. More or less than ten?
A. Yes.
Q. Well, more than ten or less than ten?
A. Less than ten.
Q. Okay. So from '97 -- how long had you been part of the highway unit?
A. At what point, sir?
Q. As of 2014, how long had you been in the highway unit?
A. Ten years.
Q. Okay. So let's take those ten years. If you say less than ten, within those ten years?
MS. GIRER-ROSENKRANTZ: Less than ten.
BY MR. HARTSHORN:
Q. For vehicular pursuit.
MS. GIRER-ROSENKRANTZ: Can you just --
MR. HARTSHORN: Sure.
BY MR. HARTSHORN:
Q. Within that ten-year period, are you saying

that you've had less than ten vehicular pursuits?
A. I'm trying to think if -- yes.
Q. Okay. So getting back to the night of the incident, can you take me from the moment, I guess, you're parked at 13th Street onward.
A. What -- what is it -- I'm sorry. Repeat one more time.
Q. Yeah. Can you describe for me -- just take me from the moment you see the offending vehicle onward.
A. Okay. I observed a red -- I believe it was a Chevy, I want to say Equinox, I'm not sure, but it was a red vehicle disregard one stop sign. I can't remember the exact route or direction it took without referring to the paperwork. Disregard one stop sign. My partner, we began to follow the vehicle where it disregarded another stop sign.
At some point we ended up on Glenwood Avenue. Excuse me. The vehicle made a wide right turn onto Glenwood Avenue, at which time we turned onto Glenwood Avenue, followed down and it blew a red signal. I want to say the red signal was 12th -- yeah, the first one was at



12th, I believe, at which time we began to pick up speed to catch up to him to pull them over, at which time the vehicle accelerated and began to go further -- you know, pull off from us.
At that time somewhere maybe around 11th Street, I believe it was, my partner activated the lights, put out the siren. We stopped at Germantown to clear traffic. As we cleared Germantown, from a distance away, we saw the vehicle that ran the two stop signs and now the two red signals begin to fishtail, which means the back end was, you know, moving left to right shaking, and then it veered left, went into oncoming traffic, struck a white vehicle that was parked unattended on the side of the road on, I guess that would have been maybe the 900 block of Glenwood, just shy of Allegheny, I believe.
After it struck that car, it left the roadway, crossed the sidewalk into a vacant parking lot, where it then flipped over end over end, and it came to rest in the field.
Q. Okay. Thank you.
MR. HARTSHORN: I'm going to mark this as Murphy 2. This is a map of the



area --
MS. GIRER-ROSENKRANTZ: That's fine. Do you want to mark it first, just so you can keep the exhibits straight.
- - -
(Documents marked for identification as Murphy Exhibit Nos. 1 and 2.)
- - -
BY MR. HARTSHORN:
Q. Officer Murphy, do you see on this map 13th Street?
A. Hold on one second. Yes.
Q. Okay. And so when you see the Chevy Equinox, you're at 13th and -- are you just south of Cambria?
A. I don't remember without looking at the paperwork. I'm sorry.
Q. Okay. What paperwork would allow you to better recollect your route?
A. I saw it in the -- maybe the 49 or the PARS. I can't remember which one. I think they both had it on there.
MS. GIRER-ROSENKRANTZ: Take a look and let him know which of these



documents --
THE WITNESS: Of course. The 7549 has it.
BY MR. HARTSHORN:
Q. Okay. Can you show me that.
A. (Witness complies.)
Q. Oh, okay. Is that Detective Murawski's report?
A. Yes. The investigation report. I'm sorry, I should have...
Q. Okay. And we'll go over that in a little bit, but does that refresh your recollection as to the route you took?
A. Yes.
Q. Okay. So getting back to Murphy 2, the -- this map here, where were you when you first noticed the Chevy Equinox?
A. I -- okay. We were north on 13th Street where the vehicle disregarded the stop sign at Cambria.
Q. Okay. So you were just south of Cambria?
A. Yes.
Q. Okay. And where was the Equinox in relation to your vehicle, how far away?

Page 37

A. I don't recall.
Q. Did you ask Officer Reid what he was doing?
A. No, I did not.
Q. Okay. Because as of this point, we have a blown stop sign on 13th, and a wide right turn and blown stop sign as the Equinox is making its right onto Glenwood; correct?
A. Yes.
Q. And you're following the vehicle, but you haven't engaged your lights or sirens yet; correct?
A. Correct.
Q. At this point in time, was it your intention to pull the vehicle over?
A. In my mind, yes.
Q. Okay. Did you ask Officer Reid if he's going to pull over the vehicle?
A. No, I did not.
Q. When you see the vehicle make its wide right going through the stop sign onto Glenwood, do you know where your vehicle was on 13th?
A. I'm sorry. Can -- repeat it one more time.
Q. Sure. When you see the vehicle, the Equinox, make its wide right onto Glenwood, do you

Page 38

recall where on 13th your vehicle was located?
A. Not too far before the -- the turn onto Glenwood. I can't recall exactly how far we were.
Q. Sure. Are you able to give me an approximation as to car lengths?
A. No. I don't recall how many car lengths.
Q. And I'm assuming, based on your prior testimony -- testimony, you don't know your speed?
A. At that time, no.
Q. You then follow the vehicle onto Glenwood; right?
A. Yes.
Q. Okay. When you turn onto Glenwood, where is the Equinox?
A. Off Glenwood a little further to the -- well --
Q. You can refer to the map too if that helps you.
A. East on Glenwood. I mean, it was ahead of us.
Q. Okay.
A. Still all within sight.
Q. Okay. Had it reached the intersection of Carnac (sic) Street?

Page 39

A. That's Camac. When we turn onto Glenwood, I want to say he was -- the -- the car was just a little bit east of Park maybe, approaching 13th.
Q. Okay. At this point in time were you able to observe its speed?
A. Its speed?
Q. Yeah. When you make your way up -- first make your way onto Glenwood, can you see the speed -- can you judge the speed, approximately, of the Equinox?
A. I couldn't tell you how fast it was going, but it did speed up. It picked up speed.
Q. Okay. When you saw that vehicle increase its speed as you made your way onto Glenwood, did you believe that it was trying to flee from you?
A. Yes.
Q. When you made your right onto Glenwood -- immediately as you make your right onto Glenwood, are the lights and sirens activated at this time?
A. No.
Q. So you see the vehicle picking up speed. Do you see it swerving on Glenwood?
A. Not at that time. Later on it does.
Q. Okay. When you first make your way onto

Page 40

Glenwood and you see the vehicle picking up speed, do you notice it weaving in and out of traffic at all?
A. No.
Q. Do you notice it almost come into contact with any other vehicles on the roadway?
A. No.
Q. Do you notice the vehicle almost striking any people, pedestrians on the roadway?
A. No.
Q. Okay. As it's making its way down Glenwood, does it disregard any other traffic control devices?
A. A red signal at 12th and...
Q. Okay.
A. ...Germantown.
Q. Okay. Where is your vehicle when you see the Equinox disregard the red signal at 12th?
A. I don't recall how far back we were. Probably about Camac Street, if I had to venture a guess.
MS. GIRER-ROSENKRANTZ: Don't guess.
BY MR. HARTSHORN:

Q. Well, I don't want you to guess. Am I correct that you don't have a recollection?
A. I -- I don't recall how far away we were when it disregarded 12th, no, I don't.
Q. Okay. Were you able to clearly see the vehicle disregard the red light?
A. Yes.
Q. Would it be fair to say that since you could see the Equinox, the Equinox driver could see you?
A. I -- I don't know if he could -- I would assume he saw us.
Q. Okay. So it runs the light on 12th. Does it disregard any other traffic control devices beyond that?
A. Once it gets to Germantown Avenue, it disregarded that one.
Q. Okay. And as it disregards that traffic control device, do you see the Equinox almost hit any other vehicles on the roadway?
A. I don't recall if -- coming through the intersection, if he came close. I can't recall.
Q. Okay. How about almost striking any pedestrians on the roadway?
A. No.



Q. Okay. No, you don't recall or no, you don't --
A. No pedestrians, no.
Q. Okay. Aside from the time when the vehicle started fishtailing, at any point in time before that did you see the Equinox almost strike any other vehicles?
A. No.
Q. Did you see the Equinox almost strike any people?
A. No.
Q. Do you recall the top speed, in your approximation, the Equal -- the Equinox reached on Glenwood?
A. I'm sorry. Did you say in my estimation or --
Q. Yes. From what you were able to observe.
A. I would estimate it got upwards to 60 miles an hour.
Q. Okay. And do you recall the speed limit on Glenwood?
A. I believe it is 35 miles an hour.
Q. Okay. Do you recall the top speed your vehicle reached on Glenwood?



A. No, I do not.
Q. Was it beyond 35?
A. I don't know since I wasn't driving.
Q. Okay. I'm assuming that at that time in your ten years in Highway Patrol you're able to gauge if the vehicle that you're riding in is going below, at, or above 35 miles an hour; correct?
A. Yes.
Q. Okay. What -- did you feel the vehicle going above 35 miles an hour as you're pursuing the Equinox, which is reaching an upwards speed of 60 miles an hour?
A. We weren't pursuing it, and it was above 35.
Q. I'll clarify that. You were following the vehicle; correct?
A. Yes.
Q. Okay. And I'm assuming to keep an eye on the vehicle, you have to increase your speed, at least to a certain point, so that you can still see the vehicle; correct?
A. Yes.
Q. Did you maintain a certain distance from the vehicle on Glenwood?



A. In my -- my -- we weren't maintaining a distance. It was creating -- the Equinox was creating the distance by the way it was being operated.
Q. Okay. Did you try to bridge that gap?
MS. GIRER-ROSENKRANTZ: Objection to form.
BY MR. HARTSHORN:
Q. Or did your vehicle, as you're proceeding down Glenwood, try to get closer to the vehicle as it was increasing its speed?
A. I'm still slightly -- can you -- can you either rephrase it or repeat it, please, 'cause I'm not --
Q. Sure. You get onto Glenwood and you see the vehicle, as you said, pick up speed.
A. Yeah.
Q. And at some point it's reaching close to 60 miles an hour or maybe above, you said?
A. Yeah, after it crossed over either 12th or Germantown, yes.
Q. Okay. At this point if you're only going a certain speed and the vehicle ahead of you is increasing its speed, at some point you would have

as Murphy Exhibit No. 9.)
- - -
BY MR. HARTSHORN:
Q. And what you have in front of you, Officer Murphy, appears to be the interview report from your interview; correct?
A. Yes.
Q. Do you know why you were interviewed?
A. It was in regards to this incident. East -- East Division, their policy is they interview arresting officers on their jobs.
Q. Okay. After every arrest?
A. As far as I know, yes.
Q. Okay. Can you, to yourself, read your answer and let me know if there are -- there's anything that's incorrect.
A. (Witness reviewing document.)
Okay.
Q. Was there anything corrected or that you would like to clarify?
A. I think I know where you're -- you're heading. It says on there --
Q. Well, I'm not headed anywhere. I just --
A. Well, I know. For lack of a better



expression, but the one section says I gave our location, let them know that we were not in pursuit. I thought I told radio we weren't in pursuit, but apparently in the transcript that's not the case. That's about it.
Q. Fair enough.
Did you ever speak with Officer, is it Latore (ph) -- is that how you pronounce his name -- about this incident?
A. I have no idea who you're talking about.
Q. Okay. Did you ever speak with Officer Conrad about this incident? Conard. Sorry.
A. Not that I recall.
Q. So you see the vehicle fishtail and then crash; right?
A. Right.
Q. What do you do after that?
A. After it crashed?
Q. Yeah.
A. I got out to check on the occupants and everything, make -- to make sure they were okay or the severity of any injuries, get rescue in there.
At the same time a crowd had formed on to that corner, and, you know, we had to



make sure that they didn't have any hostile intentions. At the same time, I'm telling them to back up and get rescue in there so they can tend to the people in that vehicle.
Q. Okay. So when you pull up, you immediately get out of the car and go to the crashed vehicle; correct?
A. Correct.
Q. And what do you see?
A. I saw the vehicle flipped over and three occupants in the vehicle.
Q. Okay. And one had been ejected?
A. From later on what I understand, yes.
Q. Okay. Where are the occupants?
A. Well, one was in the grass field further away from the vehicle. I guess that would have been a, let's see, northeasterly direction on the diagonal from -- away from the car. The other three were inside the vehicle. It was -- I can't recall exactly, but I think one in the front seat, but he was laying into the back seat, two in the back seat, one laying a little bit forward from the accident being flipped around, but three of them were in the car.



Q. And did you try to remove them from the vehicle?
A. No, I did not.
Q. Okay. Did they -- did the occupants of the vehicle appear injured to you?
A. Yes.
Q. And what did you do once you observed the occupants in the vehicle?
A. I told them: Don't move; don't try to get out; you don't know the extent of your injuries. We have rescue and the fire department coming to get you out. They will -- you know, this way they can stabilize you in case something else is internally wrong with you. That's why I'm not taking you out of the car. Just stay put. They're coming, and that was it.
Q. And then did you leave the vehicle?
A. At one point I did because the crowd had started to come up. On that corner lot there were, I refer to 'em as Jersey barricades --
Q. Sure.
A. -- and a couple of them came all the way up onto the -- by the Jersey barrier. It looked like they wanted to come over, so I was telling them,

Page 93

listen, to help them, clear out of the street, we need to have rescue come in here. Meanwhile, they're shouting at us, you know. I don't recall why. I just remember one person saying: Get 'em out of the car; help 'em, help 'em, and I had to explain to her that could hurt them more. That's why I'm leaving them in there.
Q. And did you ever return to the vehicle?
A. Yes, I did.
Q. When was that?
A. Right after I told the crowd to clear out.
Q. Okay.
A. I figured I gave them one warning. If -- so be it, if they want to rush in there, then so be it. Let me go back to the car to tend to them and try to keep them calm and not move around too much as to maybe injure themself more.
MR. HARTSHORN: Do you want to --
THE VIDEOGRAPHER: Yeah, sure.
The time is 12:36 p.m. We are off video record.
- - -
(A break was taken at this time.)
- - -

Page 94

(Document marked for identification as Murphy Exhibit No. 10.)
- - -
THE VIDEOGRAPHER: Stand by, please.
The time is 12:42 p.m. We are back on video record.
- - -
BY MR. HARTSHORN:
Q. Officer Murphy, you say you returned to the vehicle. Was that -- for what purpose was that?
A. To once again check on the people that were inside the vehicle and make sure they didn't get out, causing maybe further injury to themselves, if -- if any.
Q. Okay. Did you also want to make sure no one fleed?
A. Yes.
Q. Now, what we've marked as Murphy 10 are three photos. Do you recognize the vehicle in that photo?
A. That's similar to the one from that day, yes.
Q. Okay. So you come back to the vehicle.

Page 95

You're making sure they don't flee. You're making sure no one moves, everyone's okay. What happens next?
A. Just waited for the arrival of fire board.
Q. Okay.
A. Fire board showed up. They took 'em out and transported 'em to area hospitals. I think they all went to Saint Chris and maybe one went to Temple.
Q. Do you know how they went there?
A. Well, I don't quite understand.
Q. Ambulance, police cruiser?
A. I just recall ambulance. Somebody might have been taken in a police car. I'm not sure.
Q. Okay. Did your vehicle transport anyone in a police cruiser?
A. No.
Q. Okay. Is it typical for a victim to be transported by a police cruiser?
A. A person, yes, can be transported by police vehicle, yes.
Q. Okay. To a hospital?
A. Sure.
Q. Okay. Do you know the extent of injuries

Page 96

that any of the occupants sustained?
A. No, I do not.
Q. Aside from at the scene, have you spoken to any of the occupants of the vehicle?
A. No.
Q. Do you know my client, Mr. Autry?
A. No.
Q. Would you be able to recognize him?
A. No.
Q. Do you know where he was seated in the vehicle?
A. No.
Q. And I'm assuming you don't know any of the injuries he sustained; correct?
A. No.
Q. Okay. Aside from -- from you, Officer Reid, the paramedics, correct, came to the scene?
A. Yes.
Q. Was there anyone else at the scene?
A. Other officers arrived, yes.
Q. Okay. Do you recall approximately how many?
A. No, I do not.
Q. Do you recognize Officer Conard as being at the scene?

Q. Okay. So you're clarifying your prior testimony?
MS. GIRER-ROSENKRANTZ: Objection to form.
BY MR. HARTSHORN:
Q. Where you said that when you made your right onto Glenwood, you could see the vehicle ahead starting to pick up speed, and at that point you thought it was trying to get away from you?
MS. GIRER-ROSENKRANTZ: Object to the form.
THE WITNESS: Maybe in the earlier testimony, I didn't mean -- well, excuse me, the markers clear of it. When we first turned onto Glenwood, it began to pick up speed. At that time everything was fine, but by the time we got down to 12th Street and blew that red signal and continued to gain momentum and pick up more speed, at that point, yes, it was beginning to flee from us, yes.
BY MR. HARTSHORN:
Q. Okay. But regardless, at no time did you institute a pursuit; correct?



A. Correct.
MR. HARTSHORN: All right. Thank you.
MS. GIRER-ROSENKRANTZ: I'm good.
THE VIDEOGRAPHER: Time is 1:07 p.m. We are off video record.
\- - -
(Witness excused.)
\- - -
(Deposition concluded at 1:07 p.m.)
\- - -



C E R T I F I C A T I O N

I, Donna Burgio Simpkins, hereby certify that the foregoing is a true and correct transcript of the proceedings held in this matter, as transcribed by me on 8-11-15.

__________________________
Donna Burgio Simpkins
Professional Court Reporter

(This certification does not apply to any reproduction of this transcript, unless under the direct supervision of the certifying reporter.)