# EXHIBIT C

**In The Matter Of:**

*AUTRY v.*

*CITY OF PHILADELPHIA, et al.,*

---

*OFFICER JASON REID*

*July 27, 2015*

---

*Francis A. Farrell & Associates*

*1300 Arrott*

*Philadelphia, Pennsylvania 19124*

Original File ReidOfficerJasonVIDEO-7-27-15-FFlm.txt

**Min-U-Script® with Word Index**

COURT OF COMMON PLEAS
OF PHILADELPHIA COUNTY

JEHIEL AUTRY, Plaintiff, -v- CITY OF PHILADELPHIA, et al., Defendants.

MAY TERM 2014
CIVIL ACTION No. 2074

Monday, July 27, 2015

Videotaped deposition of POLICE OFFICER JASON REID, taken pursuant to notice at the Law Offices of Michael T. van der Veen, 1219 Spruce Street, Philadelphia, Pennsylvania, on the above date, commencing at 1:15 p.m., before Suzanne Wackowski, Professional Court Reporter and Notary Public.

FRANCIS A. FARRELL & ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
PENNSYLVANIA, NEW JERSEY AND DELAWARE
215-834-4288



APPEARANCES:

THE LAW OFFICES OF MICHAEL T. VAN DER VEEN
BY: ANTHONY BOCCHINO, ESQUIRE
MARINA MAKKAR
1219 Spruce Street
Philadelphia, Pennsylvania 19107

Representing the Plaintiff

THE CITY OF PHILADELPHIA LAW DEPARTMENT
BY: CHRISTOPHER H. RIDER, ESQUIRE
Claims Unit
One Parkway Building
1515 Arch Street, 14th Floor
Philadelphia, Pennsylvania 19102

Representing the Defendants

ALSO PRESENT: Frank Farrell, video specialist



I N D E X


| WITNESS | PAGE |
|---|---|
| OFFICER JASON REID | |
| By: Mr. Bocchino | 6 |


- - -

E X H I B I T S


| NUMBER | DESCRIPTION | PAGE MARKED |
|---|---|---|
| P-1 | Google Map | 4 |
| P-2 | Phila. PD Investigation Report | 4 |
| P-3 | East Band Recordings 5/9/14 | 4 |
| P-4 | Phila. PD Directive 41 | 4 |
| P-5 | Complaint or Incident Report | 4 |




STIPULATION OF COUNSEL

- - -

It is hereby stipulated and agreed by and between counsel that the reading, certification, sealing, and filing are waived; and that all objections, except as to the form of the question, are reserved until the time of trial.

- - -

(Exhibits P-1 through P-5 were marked for identification.)

- - -

THE VIDEO SPECIALIST: Your Honor, Counsels, ladies, and gentlemen, my name is Frank Farrell, and I will be the video specialist. The court reporter is Suzi Wackowski. And we're here for Francis A. Farrell and Associates.

This is the videotaped deposition of Officer Jason Reid being taken by the plaintiff in the matter of Jehiel Autry versus the City of Philadelphia, et al., in the Court of

Page 21

bachelor's -- bachelor's of arts.
Q Oh, good. Oh, okay. I didn't know that. I knew it was a good school but didn't know that.
All right. And is a master's in science, what -- what did that prepare you to do occupation-wise?
A I had once had aspirations to possibly teach once I left this job.
Q Okay.
A I was preparing to possibly be an educator. And I really enjoy what I do.
Q You really enjoy what you do?
A I really enjoy what I do.
Q Well, I was a -- I was a law professor for 37 years, and I recommend it. So if you -- if you get the -- get the urge, take it. It's a lot easier job than the one you have right now, I can tell you that.
All right. Did you have -- did you take any further degrees at Howard or otherwise?
A No, sir.
Q All right. Now, is there any other education that you've received, other than your Howard bachelor's degree?

Page 22

A No.
Q So if I've got it right, public schools, Howel Military Academy, Marine Corps, Howard, police department, every training available at your rank?
A Yes.
Q Have I got it right?
A Yes, sir.
Q Okay. All right. While you were in the training that you were -- that you were -- that you received, was there a particular training for -- in the operation of patrol vehicles?
A Yes.
Q And when did that training begin?
A You go through significant training in the academy as far as driver training, driver education, control over motor vehicle, things of that nature.
Q Okay. And how long did that training last?
A Weeks.
Q Weeks?
A And then you have to re-cert almost every year. Also, you have to be familiar with your directives in reference to the operation of a motor vehicle, police operation, not to mention countless

Page 23

on-the-job trainings, i.e., everyday operation being a police officer.
Q Okay. All right. You mentioned directives. Are -- what are -- what is exactly a directive?
A A directive is what we have -- the guidelines in which police officers adhere to.
Q All right. And while you were at the academy, were you given the directives that were necessary for you to have in order to operate a motor vehicle, a patrol vehicle on behalf of the Philadelphia Police Department?
A Yes, and they're commonly updated. Yes, and they are very commonly updated.
Q Updated. And do you receive updates when they come in?
A Yes, sir.
Q Do you maintain those directives in any way, yourself, personally?
A I do.
Q And how are they maintained?
A In my case, although, I haven't taken a test, I've studied extensively. So I keep them on a downloaded file. I also have a binder with them in

Page 24

it.
Q All right. So you have a binder, and you have it also on a -- on a computer?
A Yes, sir.
Q All right. And if we needed to get access to those directives, could you provide copies of it for us?
A I'm not --
Q The ones that you -- that you maintained?
A I'm not sure I'm allowed to. But that's something you would have to address with my attorney.
Q Well, I -- I understand. No, I'm asking, are they -- I'm not asking you to give us a legal opinion, you've got a great counselor to take care of that. What I'm asking is that if we wanted to see those and if it was legitimate for those -- for us to see them, could you, in fact, physically collect them for us?
A Yes.
Q All right. Fine.
You say that the directives are updated constantly?
A Frequently.

Page 25

Q Okay. And how frequently do you think that they are -- I assume there are directives for all the things that police officers do, right?
A Yes.
Q With regard to the operation of patrol vehicles, how frequently are the directives updated?
A I'm not sure.
Q Can you give us -- give us some parameters? Would it be once a year?
A I -- I honestly can't answer that. I'm not sure.
Q Okay. All right. But if we looked back into the records that you have, would we be able to see where they had changed or been updated?
A Most likely, yeah. Most likely, yes, sir.
Q Okay. And when was the last time that you got a directive with regard to the operation of -- of police vehicles?
A Either January or February of this year.
Q Of this year?
A Yes, sir.
Q All right. All right. And in particular, is there a directive with regard to the operation of a -- of a patrol vehicle with regard to pursuits?

Page 26

A Yes.
Q And when was the last time that the directive as to pursuits was updated, as far as you know?
A I'm not sure.
Q All right. If I had received from the City, a directive on pursuits numbered 41, updated on December 31st of 2008, does that sound like the most recent of them that you have?
A No.
Q It does not?
A No.
Q So there have been directives that have -- with regard to pursuits by -- with a motor vehicle for the police department, that have been updated since November -- December 31st of 2008?
A As far as the changes in the directives, I can't speak to that. What I can speak to is, I've been issued directives; Directive 41.
Q Right.
A More recently than 2008, sir.
Q Okay. So -- so the directives are republished every year, is that it or?
A Yes.

Page 27

Q All right. And does the fact that they're republished every year, does that mean that they change every year?
A In some cases, yes. In some cases, no.
Q Okay. So just because there's a new directive, doesn't mean that it's actually changed?
A In some cases, yes. In some cases, no.
Q Right. Okay.
A There's also additions to the number of directives.
Q Right. Okay. I'm -- I'm interested in particulars because of the situation that we're talking about here in terms of Directive 41. And is there -- I know that you can't tell us what the changes were, if any, since 2008, but can you tell us how frequently those changes have occurred?
A As far as to the pursuit policy, I'm not sure there has been any since 2008.
Q Okay. And that would include both changes and additions to the directive?
A Yes.
Q All right. Well, in a little bit, we're going to go over that directive, and you can tell us if it's consistent with the one that you're using

Page 28

today. And so that will take care of -- that will take care of -- of that.
In your job as a patrol officer -- and I know that you've had assignments out of the special -- the special units. Is that what I would call it? A special unit or a special assignment?
A Yes.
Q In addition to doing that, you've also operated -- been a patrol officer in a police vehicle, right?
A Yes.
Q All right. And how much of your work in the last, oh, say, three years, has been as a patrol officer?
A It's all patrol.
Q All patrol. Okay.
And when you work as a patrol officer, do you work with a partner?
A Yes, I do.
Q And when you have a partner and in a patrol vehicle, are there different functions that are -- obviously, there's some different functions -- but are there different functions that are -- that are taken on by the two officers?

Page 77

Q Why was that?
A We don't pursue for traffic violations.
Q Okay.
A That's why I'm waiting for that tag to come back. It wasn't until he -- the driver of that vehicle, I felt that vehicle to be an imminent risk to the public...
Q Right.
A That I decided to follow that vehicle and stay with that vehicle. I'm still waiting for that -- it sometimes takes a while for the information to come back on the tag.
Q All right. Got ya. So you then follow him through -- I take it you stop at the stop sign and then go through?
A Yes. I cleared the stop sign. Yes, I did.
Q And when you say "cleared it," that means you stopped so you can -- saw it was clear?
A I stopped, made sure that no one was coming either way, and I went.
Q How far away from you was the Equinox at that point?
A Almost a block.

Page 78

Q All right. So he was -- he was almost up to Glenwood then, right?
A That's correct.
Q All right. And what did he do?
A He disregarded another stop sign and made a right turn.
Q Okay. Seeing that, did you consider using either your sound or your lights to sort of shock him into stopping?
A That doesn't work.
Q That doesn't work?
A No.
Q Really?
A The common practice for something like this, you follow the vehicle at a distance, you stay a clean distance from the car.
Q Okay?
A And you go over your radio.
Q All right.
A You -- the more officers you can get in the area... We also have a helicopter, things of that nature. I know who he is.
Q Okay. All right. So as he's going -- as you're -- you're behind him and following the same

Page 79

path that he is?
A Yes.
Q What you -- you believe that your partner is checking on the license plate?
A Yes, sir.
Q Is the officer calling for assistance like you just suggested?
A Not yet.
Q Okay. But he had -- he had now busted two stop signs, and he was traveling at a high rate of speed, and he cleared a block --
A Yes.
Q -- in the time it took you to get by four cars, right?
A Yes.
Q And you didn't think it was time at that point to call for -- for any extra -- extra help?
A Yes.
Q Looking back at it, do you think you should have?
A No.
Q Okay. And you didn't consider putting on your sirens or your lights because you didn't think that would have any good effect?

Page 80

A It's not a thing of good effect.
Q What is it?
A If he thinks he got away, he slows down. If he thinks he's free, he slows down. As long as I can keep him in eye -- in my field of vision, in my line of sight... I have a helicopter.
Q Okay.
A I can -- he can be two blocks up. And this is a straightaway. I'm very familiar with this area.
Q Okay.
A Glenwood is straight. He can be two blocks down.
Q Right. But if you can see him, he can see you, right?
A That's correct. But if I --
Q So, I mean, how would he think that he had gotten away if he can still see you?
A Because, sir, if I activate my lights, he has a 100 percent no -- he has absolutely no doubt that I'm coming after him.
Q Okay.
A Without my lights on, he sees me back, I'm driving at a regular rate of speed, and I can keep

Page 133

\- - -

E R R A T A   S H E E T

\- - -

Page Line Change

____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________
____________________________________________________

Page 134

ACKNOWLEDGMENT OF DEPONENT

I, ______________, do hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

__________________ __________________

Date Signature

Subscribed and sworn to before me this ___ day of ___________, 2015.

My commission expires: ___________________________

____________________________________________________
Notary Public